SIDONIA EDER, as Executrix of JOSEPH EDER, Deceased, Appellant, v. ROBERT CASHIN, Respondent, et al., Defendants.

Third Department, March 18, 1953.

*Alfred S. Julien* and *Stanley R. Bookstein* for appellant.

*Kenneth J. Dugan* and *P. C. Dugan* for respondent.

FOSTER, P. J. Appeal from a judgment of no cause of action in an action for wrongful death.

On March 18, 1948, decedent and his wife were walking southerly upon the east side of a public highway just northerly of the village of Saugerties, New York. Defendant's truck, operated by himself, was proceeding in a northerly direction. Decedent's body in some manner, not clearly revealed by the evidence, came into contact with the truck and he was killed. Mrs. Eder said on the trial that she was walking on the shoulder of the highway; that her husband was about a foot in on the macadam and slightly behind her, holding her right arm with his left hand. She did not see him struck, but as the truck passed her, so close that the wind from it affected her balance, she felt a pull on her right arm and turning around she saw her husband lay prone on the pavement. The driver of the truck did not sound a horn and in her opinion the truck was traveling fast.

Defendant testified that his truck was in the middle of the road when the forward part of the truck passed plaintiff and her husband, and that the speed of the truck was between twenty and twenty-eight miles an hour. A pedestrian in the same vicinity, apparently disinterested, corroborated his estimate as to speed. Defendant also testified that as his truck was passing the couple he looked into his mirror and saw the man in a diving position. He did not know at the time whether the man was going in under the truck or back of it. There was testimony that after the accident there were no marks on the body of the truck but some brain matter and hair were found on the inside of the right rear dual wheels.

This brief summary of testimony points up the conflicting contentions of the parties: (1) the contention of plaintiff that

the truck was running fast, and without warning passed so close to her husband that he was struck or sucked in under the right rear wheels; (2) the contention of the defendant that he was operating his truck in the middle of the road, at a fair rate of speed; and inferentially that decedent committed suicide by throwing himself under the right rear wheels.

Proof of negligence was scant but we think it was sufficient to send the case to the jury. In a death case a plaintiff is not held to the high degree of proof required in a case where the injured party is living (*Noseworthy* v. *City of New York,* 298 N. Y. 76, 80). If there is a possible hypothesis on the evidence denying fault to the intestate and permitting an imputation of negligence to the defendant the case is for the jury (*O'Brien* v. *Lehigh Valley R. R. Co.,* 177 Misc. 25, affd. 264 App. Div. 831, affd. 289 N. Y. 783; *Chamberlain* v. *Lehigh Valley R. R. Co.,* 238 N. Y. 233). A jury having decided the case against plaintiff we would be constrained to affirm except for an assignment of error in connection with the reception of medical testimony and hospital records. This evidence had to do with the prior treatment of decedent for a mental ailment.

Decedent was a baker, and was last employed November 22, 1947. His widow admitted on cross-examination that he suffered a nervous breakdown and was treated in January, 1948, by a physician in Catskill, New York. Thereafter he entered the Mosher Memorial branch of the Albany Hospital where he was treated by Doctor Lipetz, who was a psychiatrist as well as a physician. Doctor Lipetz was called by the defendant and over the objection of the plaintiff was permitted to testify that decedent suffered from involutional melancholia, and was given electrical shock treatments and insulin. Twice during her testimony she indicated that decedent had suicidal tendencies and lacked a desire to live. Such statements were stricken out by the Trial Justice on the ground they tended to disgrace the memory of the decedent. This was in the presence of the jurors but they were not instructed to disregard such abortive testimony. Decedent left the hospital on February 18, 1948, but Doctor Lipetz continued to treat him as an ambulatory patient and last saw him on March 16, 1948, which was two days before the accident. According to her testimony he was still mentally ill at that time.

Hospital records, from which were deleted certain observations and statements relative to decedent's symptoms and demeanor as a patient, were received in evidence over plaintiff's

objection. Portions of these records, dealing with decedent's conduct and symptoms which the trial court did not deem objectionable, were read to the jury. They indicated decedent to have been depressed and agitated at times, at other times excited and confused, at other times silly and giggling; that he believed himself inadequate and had lost interest in everything.

This was a death case and plaintiff tendered the issue of pecuniary loss sustained by the next of kin, who in this case happens to be herself alone. Decedent left no children. On that issue any proof as to age, sex, health, intelligence, habits, earning capacity, life expectancy and the like, was competent unless prohibited by statute (*Houghkirk* v. *President, etc., D. & H. Canal Co.*, 92 N. Y. 219; *Sider* v. *General Elec. Co.*, 238 N. Y. 64). Obviously the medical evidence complained of was, in the absence of any statutory prohibition, a strictly logical method of proof to combat or minimize the claim for pecuniary loss. It showed that decedent had suffered from a mental disorder only a short time before the accident, which tended to make his pecuniary worth even more speculative and doubtful than would have been the case had he been a normal individual. Even the evidence stricken out, that he had suicidal tendencies, would have a strictly logical connection with the inferential defense that he committed suicide. There are however statutes dealing with privileged communications which, although they may interfere with logical processes of proof, cannot be disregarded. Ordinarily a physician may not disclose any information which he acquired in attending a patient in a professional capacity and which was necessary to enable him to act in that capacity (Civ. Prac. Act, § 352). In a personal injury action where plaintiff tenders to the jury the issue of his physical condition he waives the privilege (*Capron* v. *Douglass*, 193 N. Y. 11; *Hethier* v. *Johns*, 233 N. Y. 370). In death cases the courts have not yet made a comparable ruling, although aside from legislative policy the reasons therefor are equally as strong in a death case as in a personal injury action, perhaps stronger in view of the measure of damages to be applied.

Where death occurs another statute applies. Section 354 of the Civil Practice Act reads in part as follows: " But a physician or surgeon or a professional or registered nurse, upon a trial or examination, may disclose any information as to the mental or physical condition of a patient who is deceased, which he acquired in attending such patient professionally, except confidential communications and such facts as would

tend to disgrace the memory of the patient, where the provisions of section three hundred and fifty-two have been expressly waived on such trial or examination by the personal representatives of the deceased patient ''.

It will be noted that this section uses the phrase '' expressly waived ''. So far as we can discover these terms have never been judicially limited. The waiver need not be in writing and it is not necessary that there be an express statement of an intention to waive (*Holcomb* v. *Harris,* 166 N. Y. 257). The common sense view would seem to be that a waiver by a personal representative need not be expressed in writing, or in any particular form, but may appear from the proof offered by such representative and the issues tendered. It would be anomalous, we think, to permit a representative to tender the issue of a decedent's pecuniary worth to his next of kin, the very essence of which involves decedent's health and earning capacity, and at the same time bar medical proof as to his actual condition of health immediately before the accident. Hence we conclude, upon general principles, that under the circumstances here there was a waiver sufficient to satisfy the requirement of the statute, even though on plaintiff's side of the case proof of decedent's health and mental condition was very slight. In so holding we are not unmindful that plaintiff, as executrix, is merely a nominal party and perhaps in the strict sense of the term is not the personal representative of the decedent (*Stutz* v. *Guardian Cab Corp.,* 273 App. Div. 4; *Davis* v. *New York Central & H. R. R. R. Co.,* 233 N. Y. 242). But if that view were adopted then no one in a death case could waive privileged communications. We do not think the Legislature had this refinement of reasoning in mind when it enacted section 354 of the Civil Practice Act, but used the term '' personal representatives '' in its broadest sense. (*Murray* v. *Physical Culture Hotel,* 258 App. Div. 334.)

However, the plaintiff was not authorized to waive everything of a privileged nature. The power of a representative is not as broad in that respect as that of a living patient, so the statute plainly indicates. Confidential communications and matters tending to disgrace the memory of a decedent are excluded from waiver. How to define confidential communications, and separate them from information acquired in attending a deceased patient, presents a difficult problem. The statute in that respect seems inconsistent, but we are required, if possible, to give effect to all of its language (*Matter of Cleveland,* 273 App. Div. 623, 625). The only practical way we see to resolve this anomaly

is to draw a distinction between oral or written communications of a confidential nature made by a decedent to his physician and information the latter acquired otherwise in the course of treatment. The former would be confidential and not subject to waiver, while the latter could be waived. This seems a somewhat artificial and unsatisfactory distinction, but the necessities of construction apparently require it until and unless the statute receives further legislative clarification.

With this variance in mind the danger of putting in evidence a melange of hospital records is obvious. In this case the records so received reveal much information which in all probability could only have come from the lips of decedent himself; that his memory was failing; that he had lost interest in everything; that he was suspicious of people and believed everybody was against him; that he believed he was inadequate; are all statements which bear the hallmark of confidential communications imparted by the decedent himself to his physician. These matters were improperly admitted in violation of the statute, and we cannot say in view of the nature of this case, they were not prejudicial. If the hospital records were to be admitted at all, they should have been culled more carefully. The objection made to their receipt in evidence was broad enough, we think, to embrace the specific objection that they were confidential.

In addition we think the abortive testimony concerning decedent's suicidal tendencies may well have had a prejudicial effect on the jury. We believe the trial court ruled correctly that such testimony tended to disgrace the memory of decedent. Whether well founded or not it has long been the common view that suicide is a disgraceful act. This view has been judicially recognized (*Meyer* v. *Knights of Pythias,* 82 App. Div. 359, affd. 178 N. Y. 63). Our own Penal Law classifies suicide as a grave public wrong (§ 2301). A tendency to commit such an act would be viewed as disgraceful by common men, and it is this viewpoint and not that of the intelligentsia which must prevail.

Although the trial court ruled correctly, so far as this evidence was concerned, no admonition was given to the jurors to disregard it. Technically the evidence was not in the case because it had been stricken out, but nevertheless the jurors heard it. That they understood the full import of the ruling without further instructions is too much to expect from a realistic viewpoint. As we have pointed out earlier the vice of such evidence is not because it lacks logical and probative value but simply because it is forbidden by statute. It would undoubtedly appeal

to any ordinarily intelligent mind, and this is all the more reason why the jurors should have been explicitly instructed to disregard it. Plaintiff was entitled to the benefit of the exclusion provision of the statute, not only in form but also in spirit.

The judgment should be reversed and a new trial granted, with costs to abide the event.

BERGAN, COON and IMRIE, JJ., concur with FOSTER, P. J.; HALPERN, J., concurs in a separate memorandum: I concur in the reversal of the judgment on the ground last given in the court's opinion but I do not agree that it was error to allow the defendant's attorney to read parts of the hospital records in evidence, after they had been carefully gone over by the court and counsel, in the absence of the jury, and all matters which might have tended to disgrace the memory of the decedent had been deleted. The statements attributed to the decedent in the remaining parts of the hospital records were not of a confidential nature and they did not, in my opinion, constitute " confidential communications " in the special sense in which that term is used in section 354 of the Civil Practice Act.

Judgment reversed, on the law, and a new trial granted, with costs to the appellant to abide the event.